UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JIM BENSMAN,

    Plaintiff,

    v.

NATIONAL PARK SERVICE,

    Defendant.

Civil Action No. 10-1910 (JEB)

**MEMORANDUM OPINION**

Plaintiff Jim Bensman brought this action against Defendant National Park Service under the Freedom of Information Act. Bensman alleges that NPS has violated FOIA by improperly denying his request for a public-interest fee waiver; he also claims that NPS failed to adhere to FOIA's 20-workday time limit for reaching a determination on his request. Both parties now move for summary judgment under Federal Rule of Civil Procedure 56(a). Because the Court finds that NPS exceeded its statutory time limit and thus cannot assess fees here, it need not reach the merits of the public-interest dispute.[1]

**I.    Background**

Plaintiff, as a hobby, uses topographical data to make electronic maps for global-positioning-system devices. Pl. Mot. at 1. After creating his maps, Plaintiff then makes them available at his website for visitors to download and use free of charge. Id., Compl., ¶ 4. The

---

[1] In considering the parties' competing Motions, the Court has reviewed the Administrative Record, Plaintiff's Motion for Summary Judgment, Defendant's Cross-Motion and Opposition to Plaintiff's Motion, Plaintiff's Reply and Opposition to Defendant's Cross-Motion, and Defendant's Reply. In addition, the Court held a hearing on August 4, 2011.

1

data Plaintiff uses to create his GPS maps is typically obtained from "numerous . . . federal, state, and local agencies by simply asking for it and explaining what it [will] be used for." Id. at 2.

Bensman became interested in acquiring similar data for lands maintained by Ozark National Scenic Riverways, a bureau managed by NPS, which is housed within the Department of the Interior. See Compl., ¶ 8. Plaintiff subsequently had phone and email conversations with NPS employees regarding the park data, but was unable to procure the desired information. Id., ¶ 7. After these unsuccessful attempts to have the data released to him, Bensman submitted a formal FOIA request to NPS on November 17, 2009, for "[a]ny and all trail data" and "[a]ny data for building locations, put ins, camping areas, parking, etc. that the NPS may have" for the relevant parklands. App. to Pl. Mot. at 1-2 ("Request"). The Request also sought a public-interest fee waiver for the records under 5 U.S.C. § 552(a)(4)(A)(iii), which requires an agency to "furnish[] [records] without any charge or at a [reduced] charge," where a requester demonstrates that "disclosure of the information . . . is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." In support of his fee-waiver request, Bensman "explain[ed] that he had no commercial interest in the files, and that releasing them served a public interest since he provides the maps he makes with this information to thousands of people free of charge." Pl. Mot. at 3.

Defendant responded on December 4, 2009, acknowledging receipt of Plaintiff's November 17 Request, assigning him a Request Number, and addressing the issue of a public-interest fee waiver. App. to Pl. Mot. at 5-6 ("Letter"). The Letter asserted that the information Plaintiff had provided in connection with his fee-waiver request "is not sufficient justification to qualify for a fee waiver under the Department of the Interior's (DOI) FOIA regulations," and it

referenced 43 C.F.R. Part 2, Appendix D. Id. at 5. Defendant "agree[d] that the records [Plaintiff requested were] not primarily in [his] commercial interest," but asked him to "provide additional information to justify [his] fee waiver request." Id. at 5-6. The Letter included suggestions on how Bensman could better formulate his fee-waiver request. Id. In pertinent part, the Letter asked him to:

> 1) Explain how the records you seek will be meaningfully informative with respect to the agency's operations and activities. Records must be sought for their informative value with respect to specifically identified government operations or activities; a request for access to records for their intrinsic informational content alone would not satisfy this threshold consideration.
>
> 2) Explain how and to whom you intend to disseminate the information and how you intend to use the information to contribute to public understanding. Passively making records available to anyone who might seek access to them does not meet the burden of demonstrating with particularity that the information will be communicated to the public.
>
> 3) Explain how release of the requested records will contribute significantly to public understanding. For example, is the information being disclosed new; does the information confirm or clarify data released previously; and is the information publicly available. Explain how disclosure will increase the level of public understanding that existed prior to disclosure.

Id. Such additional information would "assist [NPS] in making a decision on [Bensman's] request for a fee waiver[.]" Id. at 5. The Letter finally directed Bensman to "provide [such] additional information to justify [his] fee waiver request or written assurance of [his] willingness to pay all fees (or specify the maximum amount that [he is] willing to pay for the bureau to process [his] request)." Id. at 6. "This [would] allow [NPS] to begin processing [Bensman's] request for records while considering [his] fee waiver request." Id.

Three days later, on December 7, 2009, Plaintiff replied to NPS's Letter. App. to Pl. Mot. at 7 ("Response"). The Response expressed Plaintiff's frustration over the "time and

3

government resources [he believed were] being wasted" handling his request, but he agreed to "answer [NPS's] questions anyway." Id. Bensman accordingly expanded his earlier fee-waiver justification to include:

> 1) The NPS builds and maintains trails and other facilities. The data I am seeking will inform the location of trails and other NPS facilities so the taxpayers can find and enjoy what their tax dollars paid for.
>
> 2) As I pointed out in my request, I do more than make the data passively available. I post it on the Internet where thousands of people have already downloaded it. When I update the maps with new data, I send out emails letting people know the new maps are available. Since thousands of people have already downloaded and installed the maps on their GPS, there is an established record of my disseminating the data.
>
> 3) It will significantly increase public understanding as the public will have the ability to see where the trails their tax dollars have paid for are located when using their Garmin GPS.

Id.

Defendant sent a second letter to Plaintiff on January 7, 2010, indicating that "a recommendation on [his] fee waiver request was forwarded to the Department of the Interior (DOI) Solicitor s [*sic*] Office in Denver." App. to Pl. Mot. at 8 ("Initial Denial"). The correspondence further explained that the Solicitor's Office had "not yet completed review of [NPS's] recommendation due to the need to further research fee waiver regulations and case law"; however, Defendant "hope[ed] to have a final determination . . . within the next 5 workdays[,]" and advised Plaintiff of his "right to treat [the] delay as a denial of [his] request." Id. Bensman submitted an appeal of the Initial Denial on January 10, 2010, in which he complained about the delay and accused NPS of "violat[ing] FOIA by not responding in the time required" by 5 U.S.C. § 552(a)(6)(A)(i). App. to Pl. Mot. at 10 ("First Appeal"). He also referenced 5 U.S.C. § 552(a)(4)(A)(viii), arguing that NPS was required to release the relevant

4

records to him at no cost because it had not reached a determination within FOIA's 20-working-day time limit. Id. at 10-11.

Seven months later, on August 17, 2010, Defendant sent two additional documents to Plaintiff. The first formally denied Plaintiff's November 17 Request because NPS "[did] not believe [Plaintiff] provided sufficient substantiation that release of the requested records is likely to contribute significantly to the public understanding of the operations and activities of the Government." App. to Pl. Mot. at 12 ("Determination"). The Determination also informed Bensman of his right to appeal the denial of his fee-waiver request and included a $1,387.20 fee estimate and additional instructions if he still wished to obtain the relevant records. Id. at 13.

The second August 17 communication from NPS denied Plaintiff's First Appeal. App. to Pl. Mot. at 15-17 ("First Appeal Denial"). The First Appeal Denial responded to Bensman's claim that NPS was required to release the requested records to him at no cost for allegedly failing to adhere to FOIA's 20-working-day time limit. Id. NPS dismissed Bensman's argument, asserting that "the 20 workday time limit only applies to those requests that are made in accordance with an agency's published FOIA regulations," and "does not begin to run until all issues regarding processing fees are resolved." Id. at 16. "In order to resolve all issues regarding fees," the First Appeal Denial averred, "the regulations require a FOIA requester to either provide adequate justification to support his entitlement to a fee waiver or provide his written assurance that he will pay the fees associated with processing the FOIA request." Id.

According to NPS, Bensman had provided neither "adequate justification to support [his] entitlement to a fee waiver," nor "written assurance that [he] would pay the fees associated with processing the FOIA request." Id. "Because of this," the Denial declared, "all issues regarding fees have not been resolved . . . ." Id. NPS further reasoned that Bensman did "not submit[] a

5

request 'in accordance with an agency's published FOIA regulations,'" and thus FOIA's time limit "does not apply to [his] November 17, 2009, FOIA request." Id. (no citation in original). The First Appeal Denial concluded, on this basis, that "the section of the FOIA that precludes an agency from assessing search fees if it fails to comply with [FOIA's] time limit also does not apply" to Bensman's request. Id.

Plaintiff subsequently filed an additional appeal challenging NPS's Determination on September 7, 2010. App. to Pl. Mot. at 18-21 ("Second Appeal"). Bensman's Second Appeal first challenged NPS's substantive arguments for denying his fee-waiver request; it then reasserted his position that "FOIA prohibits [charging him fees] due to [NPS's] failure to comply with deadlines." Id. at 19. Plaintiff also argued that NPS failed to rule on his First Appeal within the statutory time limit, thus constituting an additional unmet deadline for which search fees could not be assessed under FOIA. Id. The Second Appeal further expressed Bensman's confusion regarding NPS's denial of his First Appeal because it "appear[ed] to be saying this 20 working day period began [the day NPS] denied [his] request." Id. at 20. Plaintiff again referenced 5 U.S.C. § 552(a)(6)(A)(ii) in support of his position that NPS exceeded FOIA's time limits in reaching determinations on both his Request and First Appeal. Id. Bensman asked NPS to "please clarify" whether his interpretation of the First Appeal Denial was correct, in case he was "missing some important point." Id.

NPS denied Plaintiff's Second Appeal on October 12, 2010. App. to Pl. Mot. at 22-30 ("Second Appeal Denial"). While the Second Appeal Denial may have discussed the denial of Plaintiff's request for a fee waiver, certain issues regarding the duration and cost of search time, Bensman's allegation that FOIA prohibits charging him fees, and an issue concerning NPS's obligation to provide Plaintiff with information regarding judicial review, the Denial failed to

6

address Bensman's central argument regarding time limits, noting cursorily that "[t]he Department rendered its decision on that appeal on August 17, 2010, and finds no basis to revisit that matter." Id. at 29. The Second Appeal Denial concluded by advising Bensman of his "right to seek judicial review of th[e] decision . . . ." Id. at 30.

Plaintiff subsequently brought this lawsuit against NPS under 5 U.S.C. §§ 552(a)(4)(B). Both parties now move for summary judgment. The suit concerns only the issue of whether Defendant properly handled Plaintiff's fee-waiver request; it does not address the documents themselves. As the Court finds that NPS exceeded FOIA's 20-working-day time limit with respect to both Plaintiff's Request and First Appeal, Defendant cannot assess fees for its search. This determination renders moot the question of whether Plaintiff adequately justified his public-interest contribution under FOIA.

## II.     Legal Standard

Summary judgment is normally granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). The mere existence of a factual dispute, by itself, is insufficient to bar summary judgment. Liberty Lobby, 477 U.S. at 248. To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier of fact could find for the non-moving party. Laningham v. U.S. Navy, 813 F.2d 1236, 1241 (D.C. Cir. 1987); Liberty Lobby, 477 U.S. at 251-52 (holding that the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

Although styled Motions for Summary Judgment, the pleadings in this case more accurately seek the Court's review of administrative decisions. The standard set forth in Rule 56(c), therefore, does not apply because of the limited role of a court in reviewing the administrative record. See Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006) (citing National Wilderness Inst. v. United States Army Corps of Eng'rs, 2005 WL 691775, at *7 (D.D.C. 2005); Fund for Animals v. Babbitt, 903 F. Supp. 96, 105 (D.D.C. 1995), amended on other grounds, 967 F. Supp. 6 (D.D.C. 1997)). "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." Id. at 90 (internal citations omitted).

Thus, "[i]n any [FOIA] action by a requester regarding the waiver of fees . . . the court shall determine the matter de novo" and review "shall be limited to the record before the agency." 5 U.S.C. § 552(a)(4)(A)(vii); see also Schoenman v. FBI, 604 F. Supp. 2d 174, 188 (D.D.C. 2009) ("In reviewing an agency's determination on a fee waiver issue, a district court must apply a *de novo* standard of review and look only to the administrative record that was before the agency at the time of its decision."); Judicial Watch, Inc. v. Gen. Servs. Admin., 2000 WL 35538030, at *4 (D.D.C. 2000) ("[T]he court may not consider new reasons by the agency that were not advanced in [the record].").

**III.    Analysis**

Plaintiff maintains that NPS improperly denied his request for a public-interest fee waiver. Even if the denial was not improper, he argues, NPS must nevertheless disclose the requested records at no charge because it failed to satisfy FOIA's 20-working-day time limit for making a determination on his request. Plaintiff specifically relies on two FOIA provisions – 5 U.S.C. §§ 552(a)(4)(A)(viii) and 552(a)(6)(A) – to support the contention that he is entitled to

8

the records free of cost. Defendant responds that its existing regulations govern the interpretation of the statute; as Plaintiff's position conflicts with such regulations, he cannot prevail. The Court will first discuss the context of the FOIA provisions and regulations at issue before considering the parties' particular arguments.

A.  Legislative History – The OPEN Government Act of 2007

Congress passed the OPEN Government Act of 2007 ("2007 Amendments") to amend certain sections of FOIA, including the provisions on which Plaintiff relies here. See Pub. L. 110-175, 121 Stat. 2524 (2007) (codified at 5 U.S.C. §§ 552(a)(4)(A) and 552(a)(6)(A)). The legislative history of the 2007 Amendments evinces a strong desire by Congress to curb agencies' delays in processing FOIA requests. See S. Rep. No. 110-59, 110th Cong., 1st Sess. (Apr. 30, 2007). The Senate report explains that the 2007 Amendments "address[] the growing backlog of FOIA requests and restore[] meaningful deadlines for agency action, by ensuring that the 20-day statutory clock runs immediately upon an agency's receipt of a request and by imposing consequences on federal agencies for missing the deadline." Id. at 3 (emphasis added). Indeed, "the major delays encountered by FOIA requestors" were "[c]hief among the problems with FOIA" that Congress sought to remedy by passing the 2007 Amendments. Id. (noting also that "the oldest outstanding FOIA requests date back to 1989 – before the collapse of the Soviet Union").

B.  Statutory Framework

To obtain information under FOIA, one must first submit a formal request to the agency from which the information is sought. See 5 U.S.C. § 552(a)(3)(A) ("[E]ach agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall

make the records promptly available to any person."). After an individual submits a request, an agency must "determine within 20 [working] days . . . after the receipt of any such request whether to comply with such request." § 552(a)(6)(A)(i). The agency must also "<u>immediately</u> notify the person making such request of such determination and the reasons therefor, and of the right of such person to appeal to the head of the agency any adverse determination." <u>Id.</u> (emphasis added).

This 20-working-day time limit also applies to any appeal. § 552(a)(6)(A)(ii) ("Each agency . . . shall make a determination with respect to any appeal within twenty [working] days . . . after the receipt of such appeal."). As part of the effort to ensure that agencies no longer skirted the statutory time limit, the 2007 Amendments clarify that "[t]he 20-day period under clause (i) shall commence on the date on which the request is first received by the appropriate component of the agency, but in any event not later than ten days after the request is first received by any component of the agency." <u>Id.</u> (emphasis added).

The 2007 Amendments' addition to § 552(a)(6)(A) further proclaims that "[t]he 20-day period shall not be tolled by the agency except" in two narrow scenarios: "[T]he agency may make one request to the requester for information and toll the 20-day period while it is awaiting such information that it has reasonably requested from the requester," § 552(a)(6)(A)(ii)(I), and agencies may also toll the statutory time limit "if necessary to clarify with the requester issues regarding fee assessment." § 552(a)(6)(A)(ii)(II). Congress was likewise direct in its pronouncement that, "[i]n either case, the agency's receipt of the requester's response to the agency's request for information or clarification <u>ends the tolling period</u>." <u>Id.</u> (emphasis added).

An additional effect of the 2007 Amendments was to impose consequences on agencies that do not act in good faith or otherwise fail to comport with FOIA's requirements. <u>See</u> S. Rep.

10

No. 110-59. To underscore Congress's belief in the importance of the statutory time limit, the 2007 Amendments declare that "[a]n agency shall not assess search fees . . . if the agency fails to comply with <u>any time limit</u>" of FOIA. § 552(a)(4)(A)(viii) (emphasis added).

    C. <u>DOI's FOIA Regulations and Guidance</u>

The most recent revisions to the Department of Interior's FOIA regulations were issued on October 21, 2002. <u>See</u> Revision of the Freedom of Information Act Regulations and Implementation of the Electronic Freedom of Information Act Amendments of 1996, 67 Fed. Reg. 64,527 (Oct. 21, 2002) (to be codified at 43 C.F.R. pt. 2). DOI's regulations, as relevant to this litigation, have thus not been altered since five years before Congress passed the 2007 Amendments substantially revamping several sections of FOIA. The applicable regulations, moreover, as well as DOI's interpretive guidance and memoranda, are themselves internally inconsistent. Some provisions imply, for example, no time limit to resolve fee issues, but require their full resolution before the 20-working-day time limit begins to run against a bureau processing a FOIA request; other provisions, conversely, require bureaus to make determinations on fee-waiver requests within the statutory time period.

For instance, at the hearing on the Motions, NPS took the position that there is no time limit within which it must decide fee waivers. Indeed, certain regulations imply as much: "The bureau will not begin processing [a] request until the fee issues are resolved." 43 C.F.R. § 2.8(b)(2). This approach, however, flies in the face of other DOI regulations on fee-waiver requests, such as § 2.19(a):

> The bureau will rely on the fee waiver justification you have submitted in your request letter. If you do not submit sufficient justification, your fee waiver request will be denied. The bureau may, at its discretion, communicate with you to request additional information if necessary. However the bureau <u>must make a determination on the fee waiver</u>

11

<u>request within the statutory time limit</u>, even if the agency has not received such additional information.

(Emphasis added).

Defendant's guidance and policy directives are similarly inconsistent. DOI publishes a FOIA Handbook, for example, that "establishes Departmentwide policies and procedures for administering and implementing FOIA." U.S. DEPARTMENT OF THE INTERIOR, DEPARTMENT MANUAL: FREEDOM OF INFORMATION ACT HANDBOOK, 383 DM 15 (effective Apr. 24, 2004) (available at http://www.doi.gov/foia/foiahandbook.html (last updated on Jan. 22, 2010)) ("Handbook"). In certain places, the Handbook expounds upon DOI's supposed policy that it "will respond to an initial FOIA request no later than 20 workdays after the appropriate bureau FOIA Contact receives the request and it is perfected (i.e., all issues regarding fees and the scope of the request are resolved)." Id. at 3.2(A). A "perfected request" is more thoroughly defined in the Handbook's first chapter as "a FOIA request for records which adequately describes the records sought, which has been received by the FOIA office of the agency or agency component in possession of the records, and for which there is no remaining question about the payment of applicable fees." Id. at 1.5(S). "The 20-workday time limit begins to run the workday after a [perfected] request . . . is received by the FOIA Contact at the bureau office that has the requested records." Id. at 3.2(A)(1).

On the other hand, the Handbook states elsewhere that the time limit does apply to fee waiver requests:

> The start of the [20-working-day] time limit may be delayed [if either] (a) [t]he requester has not stated a willingness to pay fees as high as those anticipated[,] [or] (b) [t]he requester has sought a fee waiver and has not indicated a willingness to pay regardless of whether a fee waiver is granted. <u>The delay applies only to the issue of providing a substantive response to the request, as the bureau must decide whether to grant the fee waiver within the statutory time limit</u>.

12

Id. at 3.2(A)(3) (emphasis added). Indeed, "[t]he office handling the request . . . is responsible for . . . [m]aking determinations on fee waiver . . . requests within the statutory time limits." Id. at 3.18(B). Once again, a "bureau will not start processing a request until [all] fee issue[s have] been resolved," but "the bureau must make a determination on [a] fee waiver request within 20 workdays . . . ." Id. at 4.11.

As a result, even if DOI's guidelines and regulations were not at odds with the 2007 Amendments, the Court would have difficulty determining which to follow and which to ignore.

D. NPS's Administrative Action

Despite the existence of the 2007 Amendments and the inherent contradictions in its own regulations, Defendant nonetheless argues that it has correctly handled Plaintiff's FOIA request here. Defendant first asserts that, under DOI's 2002 regulations, Plaintiff never submitted a "perfected" FOIA request, and thus the statutory time limit never started to run. See Def. Mot. at 10. Even if the time limit did start, Defendant also argues, its December 4 Letter actually constituted a rejection of Plaintiff's fee-waiver request. Id. It thus acted in a timely fashion. Or, in the alternative, Defendant claims that the December 4 Letter tolled the time limit indefinitely until any lingering fee issues were sufficiently resolved. See id. at 11 ("At that point, the twenty (20) working day time was tolled until the fee waiver issue was resolved."); see also Def. Reply at 3 ("Plaintiff['s] failure to provide meaningful facts to support his claim for a fee waiver is the **only** reason for tolling the time.") (emphasis in original). Finally, at the hearing, Defendant took the position that "exceptional circumstances" existed to justify the delay in its determination.

None of these arguments, singly or in concert, holds up. First, the 2002 regulations do not trump the 2007 Amendments. Where Defendant relies on a "perfecting" rationale or a tolling theory that is contrary to the Amendments, it cannot prevail. Second, even if the December 4

13

Letter marks a timely rejection of Plaintiff's initial request – which it does not – Defendant offers no explanation that it timely handled Plaintiff's appeal. Finally, the exceptional-circumstances position is supported by neither the statute nor the record of this case.

      1. Chevron *Analysis*

The first question, therefore, is how to interpret the 2002 regulations in light of the 2007 Amendments. (To even embark on this analysis, the Court must cherry-pick regulations Defendant likes and ignore the aforementioned inconsistencies.) "[F]or regulations to be valid they must be consistent with the statute under which they were promulgated." Ashton v. Pierce, 716 F.2d 56, 60 (D.C. Cir. 1983) (internal quotation marks omitted). An agency's regulations "must be found to be consistent with the [C]ongressional purposes underlying the authorizing statute." Planned Parenthood Federation of America, Inc. v. Heckler, 712 F.2d 650, 655 (D.C. Cir. 1983); see also Morton v. Ruiz, 415 U.S. 199, 237 (1974); Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381 (1969). "[R]egulations can be sustained only if th[e] 'reviewing court [is] reasonably able to conclude that the grant of authority contemplates the regulations [at] issue.'" Heckler, 712 F.2d at 655 (quoting Chrysler Corp. v. Brown, 441 U.S. 281, 308 (1979)). It is thus "[a]n essential function of the reviewing court . . . to guard against bureaucratic excesses by ensuring that administrative agencies remain within the bounds of their delegated authority." Id.

In Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), the Supreme Court outlined the process courts must follow when reviewing an agency's interpretation of a statute. See also Village of Barrington, Ill. v. Surface Transp. Bd., 636 F.3d 650 (D.C. Cir. 2011) (applying Chevron). Challenges to agency interpretations are typically seen in litigation under the Administrative Procedure Act, as the APA expressly provides for

14

such judicial review. See 5 U.S.C. § 706. The Chevron analysis is equally applicable to FOIA cases, however, because "the relief available under FOIA is of the 'same genre' as the relief available under the APA." Feinman v. F.B.I., 713 F. Supp. 2d 70, 78 (D.D.C. 2010) (quoting Garcia v. Vilsack, 563 F.3d 519, 522 (D.C. Cir. 2009)).

The Chevron standard employs a two-tiered analysis. Under the first step ("Chevron Step One"), courts must "look[] to whether Congress has 'directly addressed the precise question at issue[,]' since a court must ensure that an agency gives effect to 'the unambiguously expressed intent of Congress.'" Career College Ass'n v. Duncan, No. 11-138, 2011 WL 2690406, at *5 (D.D.C. July 12, 2011) (quoting Chevron, 467 U.S. at 842–43).

If Congress did not unambiguously express its intent, courts will proceed to the second phase of the Chevron test ("Chevron Step Two"). Id. Under Chevron Step Two, a court "must determine the level of deference due to the agency's interpretation of the laws it administers." Id. at *6; see also Mount Royal Joint Venture v. Kempthorne, 477 F.3d 745, 754 (D.C. Cir. 2007). Where an agency promulgates its interpretation through notice-and-comment rulemaking, courts typically give the agency's interpretation "Chevron deference." Kempthorne, 477 F.3d at 754; see also United States v. Mead Corp., 533 U.S. 218, 230-31 (2001). In other words, a court "determine[s] whether [an agency's] interpretation is 'permissible' or 'reasonable,' . . . giving 'controlling weight' to the agency's interpretation unless it is 'arbitrary, capricious, or manifestly contrary to the statute.'" Kempthorne, 477 F.3d at 754 (quoting Chevron, 467 U.S. at 843-44) (internal citation omitted).

Under Chevron Step One, courts "employ[] traditional tools of statutory construction," 467 U.S. at 843 n.9, "to determine whether Congress has 'unambiguously foreclosed the agency's statutory interpretation.'" Village of Barrington, 636 F.3d at 659 (quoting Catawba

15

County, N.C. v. EPA, 571 F.3d 20, 35 (D.C. Cir. 2009)). "Congress may have done so . . . either by prescribing a precise course of conduct other than the one chosen by the agency, or by granting the agency a range of interpretive discretion that the agency has clearly exceeded." Id. At this stage, courts afford an agency's interpretation no special deference: "[I]f the agency has either violated Congress's precise instructions or exceeded the statute's clear boundaries then, as Chevron puts it, 'that is the end of the matter' – the agency's interpretation is unlawful" Id. at 660 (quoting Chevron, 467 U.S. at 842).

Traditional tools of statutory interpretation include analysis of the statutory text, legislative history, and structure. Alliance for Natural Health U.S. v. Sebelius, No. 09-1523, 2011 WL 1296888, at *11 (D.D.C. Apr. 6, 2011). "[T]he meaning of statutory language, plain or not, depends on context." Holloway v. United States, 526 U.S. 1, 7 (1999) (citation omitted). It is thus "'a fundamental canon of statutory construction that the words of a statute must be read . . . with a view to their place in the overall statutory scheme.'" ArQule, Inc. v. Kappos, No. 10-1904, 2011 WL 2469826, at *5 (D.D.C. June 22, 2011) (quoting Davis v. Mich. Dep't of Treasury, 489 U.S. 803, 809 (1989)). An equally ensconced canon of statutory construction requires courts "'to construe related statutory provisions in similar fashion.'" Id. at *7 (quoting United States v. Delgado-Garcia, 374 F.3d 1337, 1347 (D.C. Cir. 2004)). Additionally, a "'fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.'" Id. at *5 (quoting Perrin v. United States, 444 U.S. 37, 42 (1979)).

The Court in this case need not look beyond Step One. This is because the language of the FOIA statute and the 2007 Amendments is unambiguous. A determination must be made within 20 working days; to the extent tolling is possible, under the 2007 Amendments a

16

requester's response to an agency's request for information or clarification "<u>ends the tolling period</u>." 5 U.S.C. § 552(a)(6)(A)(ii)(II) (emphasis added). DOI's assertion that its regulations permit indefinite tolling must yield to the unequivocal expression of Congress's intent. Where Congress has addressed the precise question at issue, Defendant's regulations cannot contradict it. In this case, Defendant asked on December 4, 2009, for further information regarding Plaintiff's fee-waiver request. Plaintiff provided that three days later. No determination was then made for over eight more months. Because this plainly violates the 2007 Amendments' proscriptions, Defendant cannot assess fees here.

If Defendant is claiming that no tolling is necessary because the clock does not even begin to run until "perfection," <u>see</u> Handbook at 1.5(S), the legislative history of the 2007 Amendments undermines such an argument. As noted, Congress was motivated in passing the 2007 Amendments to curtail lengthy delays by agencies processing FOIA requests. Defendant's position is not only contrary to Congressional intent, but it also makes surplusage of the 2007 Amendments' entire 143-word addition to 5 U.S.C. § 552(a)(6)(A)(ii). Because Defendant's proffered interpretation would require all issues regarding fee assessment to be resolved prior to even starting the 20-working-day time limit, it follows that there would never be a need to clarify fee issues once the time limit did commence; this necessarily must have already taken place. Such a contradiction with the statute cannot pass muster.

Such a position is even more curious because Defendant's own regulations and internal memoranda explicitly acknowledge, in at least four instances, that the statutory time limit does in fact apply to fee-waiver requests. <u>See</u> 43 C.F.R. 2.19(a) ("[T]he bureau must make a determination on [a] fee waiver request within the statutory time limit."); Handbook at 3.2(A)(3)(b) ("[A] bureau must decide whether to grant [a] fee waiver request within the

17

statutory time limit."); id. at 3.18(B) (requiring "determinations on fee waiver . . . requests" to be made "within the statutory time limits."); id. at 4.11 ("[I]f the requester has asked for a fee waiver, the bureau must make a determination on the fee waiver request within 20 workdays"). In passing the 2007 Amendments, Congress did more than "address[] the precise question at issue" here, Chevron, 467 U.S. at 843; indeed, this "precise question" served as an impetus for the Amendments' enactment.

### 2. *Other Arguments*

Defendant next maintains that, even if the statutory time limit did apply to Plaintiff's November 17 Request, Defendant timely denied the Request in its December 4 Letter. This argument appears for the first time in Defendant's pleadings and was never raised in its correspondence with Plaintiff. The Court may not entertain litigation positions newly adopted by Defendant after Plaintiff filed suit; even if it could, the Letter does not qualify as a denial under Defendant's own regulations.

Where DOI denies requests for fee waivers, its regulations state that it must notify requesters, in writing, of the following:

> (1) The basis for the denial, including a full explanation of why your fee waiver request did not meet DOI's fee waiver criteria[;]
>
> (2) The name(s) and title(s) and position(s) of each person responsible for the denial;
>
> (3) The name and title of the Office of the Solicitor attorney consulted; and
>
> (4) A statement that the denial may be appealed within 30 workdays after the date of the denial letter to the FOIA Appeals Officer[.]

§ 2.19(c). The December 4 Letter contains, at best, information sufficient to satisfy one of these four criteria.

18

The language within the four corners of the Letter itself moreover belies Defendant's position. Although the Letter does state that the information Plaintiff provided in his Request "is not sufficient justification to qualify for a fee waiver," it asks Plaintiff to "assist [NPS] in making a decision on [his] request for a fee waiver." Id. at 5. It additionally informs Plaintiff that NPS must hear from him "within 20 work days . . . [or NPS] will deny [Plaintiff's] fee waiver request . . . ." Id. at 6 (emphasis added). Such language is exclusively indicative of an event that has not yet occurred; it discusses the possibility of a future denial and what can be done to avoid it. The Letter is thus obviously not a denial itself.

Even if the December 4 Letter somehow did act as a denial, Defendant still could not prevail. This is because, as it candidly conceded at the hearing, the 20-working-day time limit also applies to the agency's internal appeals process. It follows, at an absolute minimum, that Defendant exceeded its time limit with respect to Plaintiff's January 10, 2010, appeal, on which NPS did not reach a determination until seven months later, on August 17, 2010.

Finally, Defendant argued at the hearing that exceptional circumstances existed surrounding Plaintiff's fee-waiver request, thus justifying extending the time limit for notifying him of its determination. First, this is an argument Defendant failed to make at the administrative level before Plaintiff brought suit, thus barring the Court's consideration of it now. Second, even at the hearing, Defendant never articulated what circumstances were "exceptional" in this seemingly routine case. Finally, such an argument fails because it conflicts with 43 C.F.R. § 2.13(d), which states that a "bureau may not take an extension of time to decide whether to grant a request for a fee waiver."

19

## IV. Conclusion

As Defendant's position is incompatible with both FOIA's legislative history and its clear statutory language, "the [C]ourt, as well as [Defendant], must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842-43. The Court's decision, however, should not be read to indicate any position on the documents themselves – *e.g.*, which should be released or in what form. The only question presented was whether NPS could assess fees in these circumstances. A separate Order consistent with this Opinion will be issued this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: August 10, 2011